May it please the court, good morning. My name is David Cortman. I represent the plaintiffs' appellants in this case. I will do my best to reserve four minutes for rebuttal. When the Idaho legislature approved charter schools, it intended to reinvigorate the educational system. And as this court is well aware, the best educational method is to utilize primary resources. Nampa Classical Academy, which is a not-for-profit, ongoing corporation, was approved by the State Board of Education to open up a charter school using the time-tested classical curriculum model. But the Charter School Commission decided to ban an entire category of primary sources solely based on their religious content and viewpoint. This sweeping book ban includes great works such as The Epic of Gilgamesh, The Iliad, The Odyssey, St. Anthony of the Desert, St. Augustine's Confessions, Luther's 95 Thesis, and so on. Did the Charter Commission go beyond the Idaho Constitution? It did, Your Honor, and it did for several reasons. Interestingly enough, which is the first place to start, is that their policy does not resemble the Idaho Constitution at all. If you look at the State Establishment Clause, it does not even use the same language in the clause, and I think this is important. The constitutional provision states, no political, sectarian, or denominational documents shall be used, yet they changed that language to mean religious. And those are certainly two different things. If you look at that same constitutional provision, it says right above, no sectarian or religious tenets and doctrines. So the Founding Fathers certainly knew the word religious. They used it in the sentence before. But yet the sentence here that's being utilized says no sectarian or denominational documents. Defendant's ban covers all religious documents and is not limited to the same language. What's also interesting is... If we take literally... No, I'm sorry. Go ahead. If you also look at the State Establishment Clause, it bans all political documents, but there's absolutely no mention in the policy about political documents being banned. And I think that's important for several reasons. Number one... So you say it doesn't go as far as the state constitution. Well, my point is it undercuts... If their legitimate interest is supposedly abiding by the state constitution, it doesn't do so. If you're abiding by a constitutional provision, you can't ignore certain provisions, cross out words you don't like, ignore other ones. Either you're enforcing the provision or you're not. But you don't have to enforce it all at once. You can do it incrementally. So what's wrong with the state starting there and then eventually cleaning up everything? Well, the reason is because there's... My understanding is there's no intention to continue on to political documents because, in our opinion, that would just create an additional constitution violation of banning more books. So now you would have all political documents banned in the public schools. Would that be the Declaration of Independence, the Magna Carta, all the documents from the Founding Fathers? Could they not be objectively studied in public schools? And that goes the same for the religious prohibition. This is not a correct reading of the State Establishment Clause. This book ban policy is a complete exaggeration of both the state and the federal establishment clauses. And I think that's the problem here. It's easier for the court to separate the two and not even have to interpret what the state constitution says. Here's the fundamental problem I have with your argument, is that in this case the speech that's being regulated is the government's own speech, not the speech of the teachers, not the speech of the parents, and not the speech of the students. So how do you have a First Amendment argument if, in fact, it's the government's speech that's being regulated? Well, there's two answers to the question. The first answer is, and I think the district court got this wrong also, even if you assume it's government speech, it is the speech of the local school district, and that's one of the problems here. In fact, the cases cited by the court below acknowledge that the local school speaks to its curriculum. Well, the local school here is Nampa Classical Academy. That's the plaintiff. Well, that's not entirely true, because the schools have to comply with the speech that's been, the standards that have been set by the governing body of the school. So the speech is from the governing body of the schools, not each local school, but the body that sets the speech for the entire school system. Well, that's exactly right, and this school district has complied with those. And, in fact, what's interesting about that question, Your Honor, is that the State Board of Education sets general educational standards. They're called thoroughness standards that are cited in the record. Once the school district complies with those standards, then the school district becomes the speaker of how to implement what textbooks to adopt, what curriculum to choose. It determines whether or not the district has complied with that standard, though. The State Board of Education. And the way they do that is not only through their thoroughness standards, but they do it through state testing every year. And interestingly enough, Nampa Classical Academy scored extremely high in their state testing under these thoroughness standards after the first year. But here's what's interesting. When you look at the record, and this is extremely important, there is no evidence in the record that contradicts the local school district's ability to determine the curriculum. In fact, if you look at the defendants themselves, this is what they say. The state superintendent, who is the highest educational officer in the state, he says, I don't think we want the state directing what curriculum local schools can use. This is Excerpt to Record 635. He also says, and this is important, too, if this is a charter school, they have their own board. It's their decision specifically as to which curriculum to use, which textbook to adopt. And interestingly enough, under state law, that speech, that authority, is given directly to the local school district. They're the elected body that determines what is taught. As long as they meet these state educational standards, which they have here. Can I ask you a question that may save us a little time? Why isn't this case moot as to the academy and as to the academy founder? I'm not talking as to the parent and the child, but as to the academy and the academy founder. The reason is that the academy is an ongoing not-for-profit corporation. Does it exist now? It exists now. Is there a functioning school now? There's not a functioning school, but interestingly, they are reapplying for a charter school petition, which is a process that takes over a year to get the petition approved, and then there's a process before opening up. And so this is an ongoing entity that's continuing to apply for a charter school petition. And so that's the reason it's not moot, because if you look at the Supreme Court in City of Erie v. Papps, I think is the case we cited in our last brief about mootness to this court, it specifically held in that case that if the corporation was ongoing and there was a possibility that they would face this again, that the case wouldn't be moot. And so that case is specifically on point. Interestingly enough, in that case, the corporation didn't even say it wanted to continue in the future, but the court said, well, if you may, we still have jurisdiction here. The corporation wants to continue and, in fact, is applying, and they're applying under the same petition that was already approved originally from the government. Let me ask you this. I'm not asking you to agree, obviously, but on the assumption for the moment that it is moot as to the academy and as to the academy founder, and that the two live litigants that we have left are a parent and a schoolchild. And a teacher. And a teacher. What First Amendment claim do they have? And I'm now not talking about the school, which may or may not be local, which would be an issue, whether it may or may not be controlled by the state policy and so on. What First Amendment argument do these continuing alive plaintiffs have, and I'm specifically now coming back to Judge Rawlinson's question, when they're challenging a governmental order as to what may or may not be taught? Sure. I think they have two different kinds. One, I would say, is derivative of the school, and here's why that's important. Even though the district court found that it was moot as to the school, we still have to understand that it's the school that develops the curriculum, and that's important because, as this court said in Downs, the local school is the speaker unless they choose the teacher to be its voice. Well, that's exactly what the school district said. It said, we want to use these texts, and we're allowing our teachers the right to use these texts. So, number one, it has a derivative right of the local school's curriculum. But secondly, as this court held in the Cohan case, which was a case about a teacher, I think it was a professor of a community college, where they found that the curriculum directive was unconstitutionally vague in that case, and so the teacher had a right to teach a certain way. They were given this vague prohibition that said, I believe you couldn't unreasonably interfere with the educational process, and the court struck that down under the First Amendment in Cohan and said that's an unconstitutionally vague prohibition on the teacher. Well, that's the same exact claim we have here, is that this policy is unconstitutionally vague because it's impossible to know what books are banned under it. And that's an interesting question. If you look at the definition from the plaintiffs, defendants, excuse me, they'll say that all religious books are banned. Well, what government official is qualified to decide what books are religious and what's not? Now, let me ask you this. The teacher, I guess you're talking about Mr. Moffitt? Yes. And is he also the founder? Yes. Different capacities, but yes. Okay. I'm assuming for the purposes of my question that it's moot as to Mr. Moffitt and also moot as to the academy itself. Okay. And what I'm asking you is, is there a First Amendment free speech claim on behalf of the parent and the child in what is taught by a school run by the government? Yes. Where does that come from? And I would say that comes from a perfect case is the Montero case, where a student has a First Amendment right to receive information. And what's important about that Montero case, I think it applies exactly to the situation. I understand there's a footnote in the case that distinguishes books regarding religion, but the court also says that it tracks the same analysis. And here's why that's important. What the court weighed in that case was the First Amendment rights of students to receive information, which is the corollary of the right to speak, as this court said, and also the teacher's right to teach, and that was balanced against the Equal Protection Clause in that case. And this court basically found that the right to receive the First Amendment rights basically outweighed the rights to equal protection. What page of Montero are you relying on? This is Montero at page 1027. And it says, The Supreme Court has addressed on a number of occasions the balancing of a school's discretion in determining educational matters with a student's First Amendment rights. And it goes on to talk about the local school district's right to develop the curriculum, which is exactly what we're talking about here. It also talks about, and this is also at 1027, the second First Amendment principle involves the student's rights to receive a broad range of information so they could freely form their own thoughts. And in this case, what's interesting, it's the same balancing test. On one side we have the student's First Amendment rights to receive information, to avoid censorship, as the court talked about in that case, to avoid the chilling effect about teachers using specific textbooks. And then it also balanced that with the Equal Protection Clause, but here it's being balanced against the Establishment Clause. So the analysis in Montero perfectly fits here, except on the other side of the coin is the Establishment Clause. And our position is the Establishment Clause here. I'm sorry to interrupt you. You went too fast. You read, or at least I think you were reading from page 1027 of the Montero case, about the broad range of thoughts, develop their own thoughts. I'm on that page. I can't find the language you were reading. It is right about a paragraph. The first paragraph after the 1027 page turns. The Supreme Court has addressed a number of occasions is the first one. Yeah, I got it. And the second one is actually in footnote 5, two times about the right to receive information. So you're down in the footnote. That's right. And what's important there, it's the same balancing test, except for on the other side of the equation here is what we would call an exaggerated Establishment Clause.  to support your argument? The first is the well-established rule that the right to receive information is an inherent corollary of the rights to free speech and press, because the right to distribute information necessarily protects the right to Well, you can't be arguing that the student has the right to receive unbridled information. So that doesn't help you. What does that mean in terms of this case? The reason it helps is because this is not a case where the school teacher or the student is going against the wishes of the school district. In fact, if you look at all the cases cited in our briefs, some of the cases even found First Amendment rights to receive against the local school district. What makes this case stronger is that this is the right to receive consistently with the school district's wishes. And that's why it's important to say that the school district is the speaker. Under state law, they're the ones who decide the curriculum. These teachers and students want to receive and teach consistently with the curriculum developed by the local school district. And I see my time is down to a minute and a half, but I'd like to reserve that for rebuttal unless there are any more current questions. Thank you. May it please the Court, plaintiffs in this case are asking this Court to do what no other circuit of the United States Supreme Court currently does, hold that teachers or students have a free speech right to add books or materials of their own choosing to the curriculum. And in particular, in this case, where the state acting as sovereign has excluded those materials from the curriculum. Well, opposing counsel says that it's the local school that's making the It's an issue of state law how the state allocates its sovereign authority over the curriculum. States like Idaho and Texas and Massachusetts retain that authority at the state level. As you read the cases in these states like Ohio, for example, or New York apparently put it at the local level. But that's really an issue of state law. The federal constitution, the First Amendment, does not step into that issue of how the right to determine the curriculum is Well, the state couldn't, you know, ban all books that have African-Americans in them, for instance. So there's some limit to what the state can do. Certainly there would be establishment clause limits. There would be limits, for example, as you just mentioned having to do with banning all discussion of, you know, you couldn't ban every book by an African-American author or something along that line. Exactly. So where do the limits lie? How do we flesh those out? Well, I think the answer is in this case we are dealing with an attempt to use sacred texts, the Bible, the Koran, Torah, Book of Mormon, which embody belief systems, the current belief systems that are in use and active participants today. But is the state of the view that those books could not be taught in an educational manner? I think there is abundant law saying that they could be taught consistently with the First Amendment. The question is whether the state has the authority as the speaker, as the prescriber of the curriculum, to say that we do not want to do that. And that's exactly what this article of the Idaho Constitution is saying. It is within the discretion of the state educational authorities to consider these books sectarian or denominational. Certainly when we speak of, quote, the Bible, you're already making a denominational choice, whether you use the Protestant or the Catholic version of the Bible. Is there a list of sacred texts that are prohibited? We gave examples. We did not try to make an exhaustive list. And the guidelines, which are in the supplemental excerpts, excuse me, the guidelines are in the excerpts of record. And then the materials that the state used from the First Amendment Foundation and the Chico State materials give some elaboration. One of the things that the state picked up on as guidelines is you should not be using texts that either promote or disparage particular religious views. And sacred texts, of course, promote the religious views of those religions that rely upon them. So the state has the constitutional authority to carve out an area that will not be part of the curriculum. So long as it doesn't violate something like the Establishment Clause, or as your example, you know, a whole category of racially... Ecoprotection, something like that. So what's your response to opposing counsel's argument that you've targeted religious texts and have not targeted other types of materials that are listed in the Constitution, such as political texts? That was the issue put in front of the Charter School Commission. The Charter School Commission was not given the other issue. That's what came up. If you look at page 854 of the excerpts of record, there's an email exchange between Kyle Borger, who was one of the officials of Napa Classical Academy, and one of the staffers for the Charter... the staffer for the Charter School Commission. It's a one-person staff. And they explained that they hadn't earlier disclosed their intent to use the Bible, the Koran, the Book of Mormon, et cetera. And so that's why it came up right when it did. And the Charter School Commission doesn't have infinite resources. It's a body of volunteers with one staffer. They took on the issue that was presented to them right then. And there's nothing, to my knowledge, illegal about that. You deal with the issue before you, not the issue that might be coming at another time. So what's your response to the question that Judge Fletcher asked regarding mootness? I think I'll divide that into two categories if I can give a two-part answer. With regard to the teachers and the students' claims, Napa Classical Academy is no longer in operation, and their claims are intimately tied to having the school, the teacher, and the student all on the same page. Without that, what if M.K. is now attending a school where the teacher doesn't want to teach these books or the school doesn't want to? There are too many impediments. There's no live controversy. All of these three have to line up together for the live controversy to continue. And I'm sorry, did I interrupt you? No, that's okay. I interrupted you. So what's your response to opposing counsel's observation that there is a pending application to resume operations at the charter school? It is pending. And until they line up everything, they need to line up. The application was reviewed by the State Department of Education. And let me just do a little bit of sidetrack. This is very confusing. There are three bodies here. The State Board of Education, which sets curriculum. The State Department of Education, which is an administrative arm of the Board of Education, which does a lot of the day-to-day K-12 supervision. And then the Charter School Commission, which charters individual public charter schools. The State Department of Education does not ultimately approve the charter. It just is a screener. The State Department of Education looked at the application and said, you haven't updated it since the one that was approved several years ago. You really need to go back and update it so we know what's going on today. And that was the information I submitted to the court in connection with my mootness letter that was filed about a week ago. But generally in other contexts, for instance, if a business is still in operation, you know, kind of dormant but still intending to gear up again, we generally have held that that does not support a mootness determination. Why is this any different? As I understand the mootness determinations, there is an exception for issues that are capable of repetition but difficult to review. And what we have here is an issue that had they maintained their charter, had they stayed financially viable, we would still have a live issue. But we have an independent issue, which is, is this a financially viable operation? And until that is resolved, they can't go forward and get their charter. And if I could also just now segue into another thing and talk about NAMPA Classical itself. NAMPA Classical has no constitutional rights. It is a creature of state law. State statute says it has the same right to sue and be sued as a school district. And there's abundant, abundant case law saying cities and counties and school districts and sewer districts and the like have no First Amendment rights. They're not persons under the 14th Amendment, nor persons who can sue under 1983. So it's the state's position that charter schools that are approved by the state are part of the state education system? Yes. And let me quote statute. Public charter schools shall be part of the state's program of public education, 33-5203-1 of the Idaho Code. And this is another thing, and I must apologize. As I prepared for my argument, I realized that I had omitted one statute from the appendix, which I should have included. And that is Idaho Code 33-52068, which says that if a charter school's charter is revoked, if that school has any net assets, they go to the state. That is a return to the chartering authority. In this case, that is the state. So in a sense, if the charter school ever got out of the hole, its assets would belong to the state. So you have an instance of the state, which owns, which has a right to any net positive assets the Nampa class school will ever obtain because its charter's been revoked, suing the state, which is all the more reason why in this instance there is no justiciable controversy between the academy and the state officers. But let me return now to the question that we were talking about earlier, whether teachers or students have a right to demand that the curriculum be varied from that prescribed by state authority. And the answer, and the circuits get to it by a variety of means, is always no in recent years. Now, there was a high-water mark of cases, and they're cited in the plaintiff's briefs,  where teachers do have free speech rights to vary the curriculum. Students have free speech rights to demand this or that book be part of the curriculum. And I can find a case like that in the Ninth Circuit as recently as 1983. But this area has not been frozen. This is a developing area of the law. When the Supreme Court came out with the government speech doctrine in the early 1990s, circuit after circuit has been backing away from those kind of That's where we are right now. I cited just two or three cases on pages 28, 29, 30 of the appellee's brief. One was written by Justice Souter in his capacity as a retired justice sitting with the First Circuit, Griswold versus Driscoll. And he made it very clear that private entities, teachers, parents, the like, students don't have a right to demand that the state change its curriculum. Now, he never used the magic word, government speech, because in his exceedingly cautious, typical manner, he went through every possible permutation of right that could be claimed and concluded that there wasn't a right. If you look at Sherosity Miller, which is a Fifth Circuit case in 2005, they very, very clearly say that the Texas curricular authorities at the state level are engaged in government speech. They are the ones who get to determine the curriculum. So there's more than one way to skin this cat. Some circuits have very explicitly held this government speech. I've often wondered, why would one want to skin a cat? I don't know the answer to that. Let alone develop several methods. And actually, the Sixth Circuit, for years and years, was off by itself. And in the second Evans-Marshall case, which I have in my updating letter updating the authorities, the Sixth Circuit has now fallen in line with the other circuits, and they're concluding that the establishment of curriculum is government speech. How do you respond to your adversary's argument derived from footnote 5 in the Montero case? He wants to use that, or they want to use that, as an argument as to why the state should be compelled to teach these documents. That was a case where, if I recall the facts, the mother of a student who was offended by Huckleberry Finn, by the racial invective of the pre-Civil War descriptions that Mark Twain was giving, wanted to remove that book from the curriculum. And the answer in the end was no, although I think it was remanded to see if there was a possible Title VI violation. I don't know what happened to the case after that. But as far as the curricular aspects, the answer is you take the curriculum that's there. But in that footnote, there was language that students have the right to receive information. And that was the focus of opposing counsel's argument, that the state is depriving these students of the right to receive information that they desire and to which they're entitled. What's your response? The answer is the law has not been static since then. There is no explicit holding that students have the right to demand Book A be removed or Book A be added. I think the case said that, that they don't have a right to demand that books be removed was the issue there. The state or the school board there did provide the books, and the parents wanted to remove them. So it's quite the opposite, in a sense, of this case. You are correct. The issue there was whether a book could be removed at the request of the parent and student. And I guess I was just leaping and saying the same logic should apply. If you don't have a right to remove a book from the curriculum, you don't have a right to add a book to the curriculum. Curricular speech, by its nature, is going to be incomplete. There's always going to be something out there that somebody would like to add. And the second Evans-Marshall case talks very, very clearly about we can't simply have multiple sovereigns. Every teacher, every student, every parent can't be a sovereign with authority over the curriculum. You can only have one curricular authority. And in this case, it's the Idaho Constitution, as interpreted by the Charter School Commission, saying what that constitutional provision means. My time is up. If there are more questions, I'll be happy to try to answer them. Thank you, counsel. Just a few quick points in response. The State Board of Education is the government entity that has original authority over the curriculum, not the Charter School Commission. And that's important here because this policy was developed by the Charter School Commission that has no authority to develop curriculum policy. They have no authority to review books. They have no authority to approve books. This policy stems from them. In fact, they make the argument in their answer, this is not the work of the State Board of Education. This is their policy. And they don't have the authority to determine the curriculum. And Idaho Code 33.16.12, if I may, it basically says that authority to govern the school district vested in the school board trustees, not delegated to the state board, is reserved to the local board of trustees. What that means is there's only two parties with curriculum power here. It's the State Board of Education and the local school district. The State Board of Education has exercised that authority by developing curriculum standards and then passing everything on to the local school district. The Charter School Commission is an outlier that has no ability to adopt this policy to ban all religious texts. And that's important here because they don't even have the authority to develop the policy that we're challenging, never mind what it's based on. What's important here also is it's not limited to sacred texts. This is not a choice of should I select this textbook or this textbook. The state certainly has a right to do that. This is an outright ban on thousands of great literary works that the local school district no longer has a right to add into its curriculum. And what's interesting here, the student and the teacher are not adding any books to the curriculum. It's a complete misunderstanding of the case. The school district has already chosen these books as part of the curriculum. The teacher and the student just don't use them. I'm a little confused about what school district has done this. It applies to more than this charter school, you're saying? This policy applies to every school district. No, no, the policy I understand is the Charter Commission policy. It's based on the charter school policy covers all charter schools under its jurisdiction. And you keep talking about a district that wants to do this. Right. I thought it was the charter school that wanted to do it. Well, it is, but in the policy it applies to all local schools. It's not limited to charter schools. Yes, but what's the district that you say you talk about the school district wants to do this? Napa Classical Academy. The academy itself. That's the charter school. That's right. But it's the same footing as far as the policy goes to apply to all local schools. The state constitution that they rely upon applies to every college, university, and public school in the state. You keep saying the district has chosen to use these books. Napa Classical Academy. But that's not a district, is it? It actually is. It's actually the Napa Classical Academy is a corporation. They're the school board, so they're equivalent to any school district the way that it's set up. And so when I say district, the Napa Classical Academy is on the same footing as a local school district. So that doesn't help you, though, because a local school district is still subject to the state board of education, and the state board of education or department of education or whoever the higher authority is says our curriculum, and that includes you as a school district, may not include these texts. So I don't understand how you're saying that the district wanted it helps you in that regard. Because the state board of education hasn't said we don't want you to use this text. The charter school commission has, and the charter school commission has no authority over curriculum. They're usurping the state board of education's authority. So what? Well, they're not a state. That doesn't help you in terms of whether or not there's a First Amendment violation. It being ultra-virus does not help you to make a First Amendment argument. It helps us in two reasons. It helps us because there's no authority to pass the policy that we're challenging here, but it also helps us, too, because there are teachers. The Cohen case, this court found there was a constitutional violation because the curriculum prohibition against the teacher was unconstitutionally vague. It's the same challenge we make here. Did you make that argument in the district court? Yes, and it's also in all of the briefing. And so the fact that this policy is unconstitutionally vague gives the teacher a First Amendment right. And what's so vague about it? I mean, it's very clear you can't teach these texts. That's what you're objecting to. Well, because the vagueness is who decides what texts are religious and what's not. Does it ban great literary works like the Iliad, the Odyssey, the Epic of Gilgamesh? This is not limited to sacred texts. This is all texts that may be deemed religious. And the question is, is who makes that decision? When the board went to ask the defendants, just here's our book list. Tell us which books are religious. The answer they got was, well, we can't tell you what's religious. Just use good judgment. Well, that's not a constitutional standard. And teachers have a right to know what they're allowed to teach and what they're not allowed to teach. And this prohibition on what's a religious book is not limited to sacred texts. It is any book that can be deemed religious. Were you going to argue at all regarding your retaliation claim? Yes. And we had that in the briefing, and I didn't want to take up time. But that's absolutely another First Amendment claim, retaliation here. Obviously— Who was retaliated against? The school district and Nampa Classical Academy and the teachers and the students because the school was shut down. And what was interesting, there was no problem with the school until they challenged this prohibition on the curriculum. Then the public records request came. Then the investigations came for financial reasons. Then the public statements that we're going to shut down the school. Then the withdrawing of the state funds that began. The financial trouble that began here was at the hands of the defendants. When the promised grants weren't delivered, that was the beginning of the shortfall. This school was fine financially until defendants decide not only to take their money away, but once they started telling the public they were going to shut down the school, while the school was still open, investors didn't want to pour any more money into it. Let me ask you this. I know that. Wait, wait. Could we handle this, please? I'm sorry. Thank you. Let me ask you this. If the school is a part of the state, how can the school sue the state under Section 1983? The reason is that, first of all, the school is a not-for-profit corporation that's doing business to serve a school. So the Kavanaugh's case out of the Ninth Circuit clearly held in that specific situation that a charter school was not a state actor. Well, but you can't be a state. I mean, the determination whether or not the school is a state actor depends on the organization, how the state legislature has set up the school. Right. And this state scheme seems to be different than others we've looked at, because it pretty much makes the charter schools the same as a public school. I would ask the Court to look at the Kavanaugh's case, because the law in Arizona that it was discussing in that case is nearly identical to the law in Idaho. No, it's not. Well, the way it describes them as public agents, the way that it talks about the setup of the system is very similar to here. No, because in Idaho the teachers get the same employment rights and the same employment protections as those in the public school system. That wasn't true in the Kavanaugh's case. Well, it's not identical, but let me read you what this Idaho statute say. Idaho Code 33-5204, subsection 1. It says, for the purposes of the retirement system in Idaho Code, a public charter school created pursuant to this chapter shall be deemed a government entity. The only place the Code says it shall be deemed a government entity is under retirement system. That's very important, though, in terms of ñ because most charter schools, they're private employees and they don't get to vest in the retirement system, they don't get those government benefits. So that's a very telling provision. Well, it is telling, because they didn't say that the charter school is a government entity, period. They said the only purpose it's a government entity is for retirement purposes, and that's very telling. Because if you name one specific thing under the codes of statutory construction, you're eliminating everything else. And so the government didn't say we're thereby claiming you're a government entity. What it basically said was you're only a government entity for one particular purpose. And obviously ñ Thank you. I see you're way over. But thank you. Thank you for your time. Case just argued will be submitted.
judges: Reinhardt, Fletcher W. , Rawlinson